Dr. Joseph GILBERT,
Plaintiff-Appellant-Cross-Appellee,

v.

Donald JOHNSON et al.,
Defendants-Appellees-Cross-Appellants,

Sam F. Lowe, Jr., Movant-Appellant.

No. 77–1063.

United States Court of Appeals,
Fifth Circuit.

Aug. 27, 1979.

Rehearing Denied Oct. 5, 1979.

Mark J. Kadish, Atlanta, Ga., for Gilbert.

H. A. Stephens, Jr., Atlanta, Ga., for Lowe.

William L. Harper, U. S. Atty., William D. Mallard, Jr., Asst. U. S. Atty., Robert J. Castellani, First Asst. U. S. Atty., Atlanta, Ga., Martin Hollander, Atty., Civ. Div., Dept. of Justice, Washington, D. C., for defendants-appellees-cross-appellants.

Before TUTTLE, GODBOLD and RUBIN, Circuit Judges.

TUTTLE, Circuit Judge:

This is an appeal from a judgment of the trial court denying to Dr. Gilbert the relief he sought against the United States Veterans Administration Hospital personnel for terminating his employment for refusal to accept a transfer from Atlanta to Birmingham.

The correctness of the judgment below depends primarily upon the answer to two questions: (1) Does the administrative record of the Veterans Administration which resulted in the disciplinary action involved in the transfer demonstrate that Dr. Gilbert had received the administrative due process to which he was entitled, and was the action neither arbitrary nor capricious? (2) was the action of the Veterans Administration within the scope of the findings and conclusion of the disciplinary board? that is, was a transfer of appellant appropriate action to be taken under the disciplinary board's recommendation of "only minimal disciplinary action?"

The defendants also appeal that part of the trial court's judgment that awarded Dr. Gilbert his full compensation between January 1, 1973 and March 17, 1975, excluding those periods during which Dr. Gilbert was on leave of absence.

The trial court viewed its function in determining whether Dr. Gilbert was entitled to relief as encompassing a review of the administrative record to determine whether the plaintiff had received the kind of hearing that is provided for persons in such a situation by the statutes, regulations of the Veterans Administration and under the due process clause of the Fifth Amendment to the Constitution. In doing so, the court correctly noted that in this Circuit judicial review of federal employee personnel decisions is limited to a determination of (1) whether the employee has been afforded administrative procedural due process as provided by statute, regulations and the Constitution; and (2) whether the decision was arbitrary or capricious. These standards are distilled from our decisions in *Davis v. Vandiver*, 494 F.2d 830 (5th Cir. 1974); *Mann v. Klassen*, 480 F.2d 159, 161 (5th Cir. 1973); *Dozier v. United States*, 473 F.2d 866 (5th Cir. 1973); *Anonymous v. Macy*, 398 F.2d 317 (5th Cir. 1968) and *Chiriaco v. United States*, 339 F.2d 588 (5th Cir. 1964). In reaching this conclusion, the trial court outlined extensive findings as to the contents of the administrative record. These include the following.

Dr. Gilbert was a trained cardiothoracic surgeon with 17 years experience when he was recruited by the Veterans Administration to be Associate Chief of Staff for Education and Research [ACOS] at the Atlanta hospital in late 1965. At the time he joined the hospital, he understood that he would have patient care duties in his specialized field, cardiothoracic surgery, besides administering the research program at the Atlanta VA Hospital. This hospital is affiliated in some degree with Emory University Medical School. The ACOS assignment did not necessarily require a cardiothoracic surgeon, since the duties of his new position were the conducting of research and administering the research program of the hospital.

The desired patient care responsibilities during his tenure between 1966 and 1970 did not develop, resulting in disappointment on Dr. Gilbert's part, coupled with frustration and apparent criticism by some of the

persons responsible for this state of affairs. These included Dr. Jarman, the VA Hospital director and Dr. Martin, Chief of Surgery at Emory University Medical School. By March, 1970, it became apparent to Dr. Jones, Chief of Staff at the VA Hospital at that time, that Dr. Gilbert's "poor interpersonal relationships" with the VA staff were interfering with his administration of the research program at the hospital. He made this a subject of his annual proficiency report.[1]

As a result of Dr. Jones' presentation, which apparently represented the hospital management's view of Dr. Gilbert's problems, Dr. Jarman, the Hospital Director, undertook to relieve Dr. Gilbert of his duties as Associate Chief of Staff, although retaining him on the Veterans Administration payroll for the purpose of continuing his own research. This action was followed by a May 6, 1970 letter by Dr. Jarman to the Veterans Administration headquarters requesting that Dr. Gilbert be reassigned to another station because of the progressive breakdown of Dr. Gilbert's relationships with "almost everyone in this hospital and Emory."

On September 22, 1970, Dr. Jarman assigned Dr. Gilbert to the examination of veterans in connection with pension and compensation claims, an inferior position which this Court, upon an appeal from an interim judgment of the district court denying Dr. Gilbert any relief, characterized as "menial" and "totally unrelated to his highly specialized field of cardiothoracic surgery." *Gilbert v. Johnson*, 490 F.2d 827, 829–30 (5th Cir. 1974). The appellant refused to accept these duties and he took a leave of absence for four months from November, 1970 to March, 1971, during which time he took refresher training in cardiovascular surgery. Upon his return from this leave in March, Dr. Gilbert was ordered transferred to the Des Moines, Iowa VA Hospital for training in general surgery. He considered this as a further attempt to strip him of his cardiothoracic surgery specialty and he claimed he was entitled to a hearing under the Veterans Administration statutes and regulations, since such action by the VA amounted to disciplinary action under 38 U.S.C. § 4110(a). The VA replied that if he did not accept the reassignment, he would be discharged. He refused to accept it and he was discharged on July 30, 1971, without a hearing.

Dr. Gilbert filed this suit on April 4, 1972. On June 16, the court held that Dr. Gilbert was entitled to a hearing pursuant to 38 U.S.C. § 4110[2] prior to discharge and or-

---

1. This report included the following:

The Research Program at this hospital does not approach the quality that is possible. It is my impression that there are few persons, if any, who would disagree with this estimate, including Dr. Gilbert himself. In my opinion, by far the most important reason for this failure has been Dr. Gilbert's inability to instill enthusiasm and his failure to encourage participation in research on the part of our staff. In fact, because of very poor interpersonal relationships, Dr. Gilbert has discouraged persons from even visiting the research areas of this hospital. Dr. Gilbert's unsatisfactory relations extend outside this hospital to involve persons in the Medical School including the Chairmen of Departments.

For the most part, information about research activities has been limited to the research areas because Dr. Gilbert has secluded himself within his office and laboratory. Everyone agrees that Dr. Gilbert has a brilliant mind and an extraordinary ability to express his thoughts both verbally and in writing; however, his extreme egocentricity makes it almost impossible for him to sensibly perceive and interpret what others are thinking or saying. It seems to me that this is the real basis for his extremely poor administrative ability. He would probably function better as an independent investigator, relieved of administrative responsibilities. In my opinion, it is not possible at this point for Dr. Gilbert to reconstitute any worthwhile relationships at this station which he may have had in the past or to generate new ones. I see no way that the research program at this hospital can profit from his continued presence.

2. This section provides as follows:

(a) The Chief Medical Director, under regulations prescribed by the Administrator shall from time to time appoint boards to be known as disciplinary boards, each such board to consist of not less than three nor more than five employees, senior in grade, of the Department of Medicine and Surgery, to determine upon notice and fair hearing,

dered that Dr. Gilbert receive back pay in compensation from the VA until the effective date of the decision of the § 4110 disciplinary board. The court however, did not order Dr. Gilbert reinstated as Associate Chief of Staff.

Explaining its reason for holding that the plaintiff was entitled to a § 4110 hearing, the court said that the VA's actions suspending him as Associate Chief of Staff, detailing him to examination of compensation and pension payments and his subsequent transfer to Des Moines, Iowa, followed by his subsequent termination in July, 1971:

> originated in personality problems or personality misunderstandings between the plaintiff and others of the Veterans Administration set-up. Apparently, it became apparent to all concerned that Dr. Gilbert would best serve the Veterans Administration somewhere other than at the Atlanta Veterans Administration Hospital.

> A major part of the job of Associate Chief of Staff of the Veterans Administration Hospital in Atlanta involved coordination of the research program including the recruitment and stimulation of other investigators who would work with or under the Associate Chief of Staff.

> A personality deficiency or personality defect that would interfere with the effective performance of that job [ACOS] is, in effect, a species of inaptitude or inefficiency with respect to the job in question. . . .

> Therefore, the removal from the job of Associate Chief of Staff, the detail to compensation claims examinations, and the transfer were in effect actions based upon charges of inaptitude or inefficiency and a hearing was required to be held with respect thereto under Title 38 U.S.C. § 4110.

On August 28, 1972, following the court's order, the VA advised Dr. Gilbert that he had been assigned once again to conduct pension and compensation examinations at the Atlanta VA Hospital. He refused this assignment, arguing that it was not consistent with the court's order, claiming that it was a damaging and punitive disciplinary action taken without a hearing and amounted to a continued attempt by the VA to arbitrarily destroy his reputation by undercutting his specialized surgical qualifications by placing him in a demeaning position.

In September, 1972, Dr. Jones, Chief of Staff of the VA Hospital began a preliminary investigation of Dr. Gilbert in preparation for the disciplinary board hearing.

charges of inaptitude, inefficiency, or misconduct of any person employed in a position provided in paragraph (1) of section 4104 of this title. When such charges concern a dentist, the majority of employees on the disciplinary board shall be dentists.

(b) The Administrator shall appoint the chairman and secretary of the board, each of whom shall have authority to administer oaths.

(c) The Chief Medical Director may designate or appoint one or more investigators, to assist each disciplinary board in the collection and presentation of evidence. Any person answering to charges before a disciplinary board may be represented by counsel of his own choosing.

(d) A disciplinary board, when in its judgment charges are sustained, shall recommend to the Administrator suitable disciplinary action, within limitations prescribed by the Administrator, which shall include reprimand, suspension without pay, reduction in grade, and discharge from the Department of Medicine and Surgery of such person. The Administrator shall either approve the recommendation of the board, approve such recommendation with modification and suspend further action at the time, or disapprove such recommendation. He shall cause to be executed such action as he approves. The decision of the Administrator shall be final.

(e) The Administrator, within such limitations as he may prescribe, may delegate to the Chief Medical Director the authority vested in him by subsections (b) and (d) of this section to (1) appoint the chairman and secretary of a disciplinary board, such official to have the power prescribed by this section, and (2) receive and act upon the recommendations of such a board. Any person against whom disciplinary action is taken under authority delegated pursuant to this subsection shall have the right to appeal such action to the Administrator, but in the absence of such an appeal the decision of the Chief Medical Director shall have the same force and effect as a decision of the Administrator.

During several following months, an effort was made to reach a negotiated settlement of the litigation. As a part of this effort, the VA offered Dr. Gilbert an assignment in his specialty, thoracic surgery, at the Little Rock, Arkansas VA Hospital. Dr. Gilbert rejected it, still contending that the VA had not complied with the court's June 16, 1972 order. Thereafter, the VA assigned Dr. Gilbert to the Outpatient Surgical Clinic of the Atlanta VA Hospital. He rejected this assignment for the same reasons he had turned down the pension and compensation examination position. Thereafter, upon the protest by Dr. Gilbert that the investigation should not be conducted by his superior, Dr. Jones, a second preliminary investigation was started by John R. Pollard of the VA's central office in Washington. In April of 1973, the VA having neither sent a letter of charges to Dr. Gilbert nor held a statutory hearing ordered by the court a year earlier, nor paid the money judgment, Gilbert filed a motion to enforce the judgment which the court denied on May 10, 1973. This Court reversed this judgment on March 6, 1974 and ordered enforcement of the June 16, 1972 judgment.

In the meantime, however, on July 25, 1973, the Veterans Administration served a letter on Dr. Gilbert charging him with failure "to effectively conduct and administer the research program of Veterans Administration Hospital, because of personality problems and personality misunderstandings. . . . " The letter then contained 22 specific charges, purporting to support the main charge and evidencing Dr. Gilbert's "frequently unsuitable [conduct] for Veterans Administration employees." These charges, if proven to the satisfaction of the board, were supportive of the board's ultimate decision. They included being "rude, discourteous and unprofessional" (Charge IV); launching "into a long tirade" (Charges VI and XXI); "starting to scream, shout and furiously wave [his] arms" (Charge XI); "angrily yelling" (Charge XVII); making "derogatory comments" (Charge XVIII); assuming "a superior air" (Charge XIX); and launching a "diatribe" (Charge XXI).

The disciplinary board hearing commenced on October 15, 1973 and extended through December 12, 1973. On July 17, 1974 the board issued its findings. The board recognized Dr. Gilbert's ability, diligence and energy but stated that "he must, we believe, bear some responsibility for the apparent antagonism evoked by his personality." The board found that "there was no evidence presented of the initiation of any research carrier development program, of any traineeship application actually funded, or of foreign fellowships developed and funded. There was not a single instance in which outside research collaboration involving program developments, *i. e.,* with the Center for Disease Control, NASA or Georgia Tech was finalized, approved and funded." The board ended its report by stating:

> To this extent the board must therefore sustain the charge alleging Dr. Gilbert's failure 'to effectively conduct and administer the research program . . because of personality problems. . . .'

This was held to be a species of "inaptitude" under 38 U.S.C. § 4110(a). Speaking to the other two grounds mentioned under § 4110(a) for disciplinary action, the board stated: "We do not find specific evidence of inefficiency or of misconduct."

The board made its recommendations in the following language: "We find many extenuating and mitigating circumstances which move us to recommend only minimal disciplinary action which we believe will be in the best interest of Dr. Gilbert and the Veterans Administration."

The disciplinary board then recommended that Dr. Gilbert be reassigned to another VA facility. These findings and recommendation were approved by the Chief Medical Officer of the Veterans Administration and on October 30, 1974, Dr. Gilbert was informed that he would be transferred to the VA Hospital in Birmingham, Alabama. The VA Administrator sustained his medical examiner's approval and the Administrator reaffirmed his decision of transferring Dr. Gilbert by letter of May 2, 1975.

Upon Dr. Gilbert's refusal to take the assignment, his services were terminated and he appealed to the district court. The court dealt in detail with each of the many contentions made by the plaintiff under the due process challenge. We have carefully considered each of these and approve the action taken by the trial court. In sum, we are satisfied that the charges made were sufficiently specific to put Dr. Gilbert on notice of what he was required to meet, the hearing was conducted properly, and the decision accorded completely with the standards of due process.

■ Appellant makes the specific contention that the only action which the board could take against him under § 4110(d) was "reprimand, suspension without pay, reduction in grade, and discharge from the department of medicine and surgery of such person," whereas, a transfer to another VA Hospital did not fall within these four specific courses of action. Appellant overlooks the fact that the statute says that the board "shall recommend to the Administrator suitable disciplinary action . . . which shall include reprimand, . . . ." The use of the word "include" clearly indicates that the courses of action that can be recommended by the board do not have to be one of the four actually mentioned. Moreover, it seems clear that since a transfer in grade and pay, without in any way restricting the full benefits of the doctor's speciality in the transferred position, is so much less severe than two of the permissible courses of action actually specified in the statute, no point can be made that the transfer was not authorized under § 4110(d).

■ Moreover, while it may be understood that a "transfer to Siberia" might normally be a very disruptive penalty to impose, we are of the view that the trial court properly held that a transfer from Atlanta to Birmingham, a distance of 160 miles, in a situation where the board found the doctor was totally unable, on account of his personality traits, to carry out the functions of his office, would seem clearly to fit into the recommendation of the board that he be subjected only to "minimal disciplinary action." This was especially true in light of the board's recommending itself "that Dr. Gilbert be reassigned to another VA facility."

■ Appellant argues strenuously that since the board stated "we do not find specific evidence of inefficiency or misconduct," the board, in effect, decided against each of the 22 specifications, but then concluded that on the general charge of inaptitude, Dr. Gilbert should be disciplined. This statement by the board is not equivalent to a finding that none of the 22 specifications had been proved. It was merely an effort by the board to make clear that, without any reference to the charge of inaptitude, the board did seek to clear Dr. Gilbert of any specific charges of "inefficiency or misconduct," two grounds upon which the board could act, in addition to the ground of inaptitude. In point of fact, the board's report discussed evidence introduced to support several of the specifications. While it is clear that the board found it a painful duty to criticize this well trained professional man, its findings fully meet the requirement of the statute and regulations and fully warrant the particular action taken pursuant thereto.

■ As we have already pointed out, the only question with respect to the due process claim is whether the administrative record demonstrates that the doctor had adequate notice and opportunity to be heard and a decision in accord with the charges made and whether the decision was arbitrary or capricious. We noted the cases of *Davis v. Vandiver,* 494 F.2d 830 (5th Cir. 1974); *Dozier v. United States,* 473 F.2d 866 (5th Cir. 1973) and *Chiriaco v. United States,* 339 F.2d 588 (5th Cir. 1964) as supporting this standard of review. However, as we did in the *Dozier* case, *supra,* we consider it not inappropriate to state that were the standard of review here that of substantial evidence on the record as a whole, as is contended for by the appellant, then we would have no hesitancy in determining that this record adequately discloses sufficient evidence to support the board's

conclusion that Dr. Gilbert failed "to effectively conduct and administer the research program . . . because of personality problems. . . ."

We have carefully analyzed the other points made by Dr. Gilbert on this appeal, and are satisfied that they were properly disposed of by the trial court.

■ The defendants appeal from a part of the judgment that required payment of Dr. Gilbert's salary until the date of the board's decision. Responding to a post-hearing motion by the government dealing with this matter, the trial court pointed out that the court had in its June 16, 1972 judgment, ordered that "the plaintiff will be entitled to receive compensation until the effective date of the decision of the board convened under the statute;" that this order was still in effect, and that except for the time taken by Dr. Gilbert on leave of absence, he was still entitled under the effective earlier order to receive compensation except when on leave of absence. We agree with that determination by the trial court. The date to which Dr. Gilbert is to receive compensation is May 2, 1975, the day on which the Administrator finally reaffirmed his decision to transfer him to Birmingham.

There is a separate appeal before this court by Sam F. Lowe, Jr., Esq., formerly counsel for Dr. Gilbert. Upon the latter's expressed wish to change counsel, Lowe sought to be relieved from any further representation by an order of the trial court. The court granted the request, but denied Lowe's motion for the right to intervene to protect his interests for a fee covering services theretofore rendered.

■ It appears that under the Georgia law (Ga.Code § 9–613), plaintiff's lawyer has a lien upon a cause of action being asserted for payment of compensation contracted to be paid for such services. It therefore appears that this was an interest in this litigation for which protection from the court can properly be sought by allowing the party to intervene in the pending action. This court has held as much in a

case involving a contingent fee arrangement in *Gaines v. Dixie Carriers, Inc. v. Plotkin, Sapir & Brandley*, 434 F.2d 52 (5th Cir. 1974). We cannot distinguish between that case and the case presented here by Mr. Lowe. The trial court should have permitted the intervention.

The judgment between the original parties is AFFIRMED and the judgment denying the Lowe intervention is REVERSED and the case is REMANDED to the trial court for further proceedings.

AFFIRMED in part, REVERSED in part, and REMANDED.

ALVIN B. RUBIN, Circuit Judge, specially concurring:

Were the matter open for consideration, I would deny lawyers employed on a contingent fee the right to intervene in order to safeguard their fees, at least when they can protect their interest in some other way. A lawyer is entitled to protection, but he can usually safeguard the fee he has earned by some means other than intervention. In such cases "the disposition of the action [will not] as a practical matter impair or impede his ability to protect that interest." Rule 24(a)(2), F.R.C.P.

In Georgia, a lawyer employed on a contingent fee basis has a lien on any recovery, and the suit may not be satisfied until the lien of the attorney is fully satisfied. Ga. Code Ann. (1973) § 9–613. *See Dorsey v. Edge*, 1947, 75 Ga.App. 388, 43 S.E.2d 425. The attorney has no right to his fee unless the event contracted for has occurred; nor may he recover his fee by action in the cause in which the fee is earned. *Haldi v. Allen*, 1977, 141 Ga.App. 414, 233 S.E.2d 478. He may, however, if discharged from the case by his client, bring an action under quantum meruit for the reasonable value of services rendered. *Brookhaven Supply Co., Inc. v. Rary*, 1974, 131 Ga.App. 310, 205 S.E.2d 885. If the client dismisses the suit, settles it, or allows it to lie dormant, the lawyer apparently may also establish the amount of recovery that could have been had, and the consequent amount of his lien, by prosecuting the suit independently. *See*

*Haldi v. Allen, supra; Dorsey v. Edge, supra.*

In Louisiana, (to whose law I advert because our prior decision in *Gaines v. Dixie Carriers, Inc.,* 5 Cir. 1970, 434 F.2d 52, involved a Louisiana lawyer-client agreement), the attorney's interest can be protected by filing the contract of employment with the clerk of court; thereafter any settlement or other disposition of the suit or claim by either the lawyer or the client without the written consent of the other is void. LSA–R.S. 37:218.

If there is an absolute right to intervene, the former lawyer may attempt to assert new issues or indeed to interfere with the management of the lawsuit by his successor as if he were a co-owner of the claim when he has only a contingent fee and should only be entitled to protection with respect to payment of the amount due him. *See* C. Wright & A. Miller, Federal Practice & Procedure: Civil § 1920 (1972); 3B Moore's Federal Practice ¶ 24.16 (2d ed. 1978).

In the present case, Mr. Lowe seeks only to collect his fee if Dr. Gilbert is successful. That right deserves protection but it can be protected by assertion of a lien. Therefore, I would prefer to hold that he is not entitled to intervene.

However, without discussion of the question of the adequacy of other protection, the right to intervene in these circumstances has been recognized both before the adoption of Rule 24, *Barnes v. Alexander,* 1914, 232 U.S. 117, 34 S.Ct. 276, 58 L.Ed. 530, and since, *Gaines v. Dixie Carriers, Inc.,* 5 Cir., *supra.* These views appear to be binding on us, but I hope that they will be reconsidered some day lest the practice of intervention permitted to lawyers formerly employed by a litigant unnecessarily adds to the length and complexity of trials.